















MEG   4/22/02    8:38

3:00-CV-00642   FEDERAL-MOGUL CORP V. TURN-KEY TECH

*150*

*OBJ.*

1  SANDEEP SETH (State Bar No. 195914)
   J. MICHAEL KALER (State Bar No. 158296)
2  9930 Mesa Rim Road
   San Diego, California 92121
3  Telephone:  (858) 824-9103
   Facsimile:  (858) 824-9153
4
   Attorneys for TURN-KEY-TECH, LLC and
   Defendant JENS OLE SORENSEN
5

6

7

8                    UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10 FEDERAL MOGUL CORP., a Michigan        ) Case No.: 00CV0642 L (NLS)
   corporation,                           ) Case No.: 99CV0321 L (NLS)
11                                         ) Case No.: 00CV0642 L (NLS)
12                 Plaintiff               )
   v.                                      ) **TURN-KEY-TECH, LLC'S**
13                                         ) **OBJECTION TO MAGISTRATE'S**
   TURN-KEY-TECH, a California limited     ) **ORDERS GRANTING MOTIONS FOR**
14 liability company, and JENS O.          ) **PROTECTIVE ORDERS AND**
   SORENSEN, an individual,                ) **DENYING RECONSIDERATION OF**
15                                         ) **SUCH ORDERS**
16                 Defendants.             )
                                           )
17                                         ) DATE:  June 3, 2002
                                           )
18                                         ) Honorable M. James Lorenz, Judge
19                                         ) Honorable Nita L. Stormes, Magistrate
                                           )
20 TURN-KEY-TECH, a California limited     )
   liability company,                      )
21                                         )
22                 Counterclaimant,        )
   v.                                      )
23                                         )
   DAIMLER CHRYSLER CORPORATION,           )
24 a Delaware corporation; COOPER          )
   INDUSTRIES, INC., an Ohio corporation,  )
25 and FEDERAL MOGUL CORP., a              )
   Michigan corporation,                   )
26                                         )
27                 Counterdefendants.      )

28

150

# TABLE OF CONTENTS

**SECTION**                                                                               **PAGE**

SUMMARY ...................................................................................1

BACKGROUND .............................................................................3

SPECIFIC LEGAL AND FACTUAL ERRORS IN THE ORDERS......................5

    A.    THE COURT'S HOLDING THAT TURN-KEY WAS A
           MARKET COMPETITOR OF THEIR MANUFACTURING
           AGENTS IS ERRONEOUS AS A MATTER OF LAW ..................9

    B.    THE COURT'S HOLDING THAT TURN-KEY'S LITIGATION
           ATTORNEYS WHOSE ONLY DUTIES WERE TO SETTLE,
           LITIGATE OR TRY THE INFRINGEMENT CASES WERE
           "COMPETITIVE DECISIONMAKERS" IS ERRONEOUS
           AS A MATTER OF LAW.................................................9

    C.    THE COURT ERRONEOUSLY CONCLUDED THAT THE
           ASSERTED HARM TO DEFENDANT JUSTIFIED
           EXCLUSION OF TURN-KEY'S WITNESSES AND
           LITIGATION COUNSEL FROM THE EVIDENCE IN THIS
           CASE WITHOUT ANY SHOWING OF TRADE SECRETS
           OR COMPETITIVE HARM ............................................11

    D.    BY NOT REQUIRING ANY EVIDENCE, THE COURT
           ERRONEOUSLY CONCLUDED THAT THE
           INFRINGEMENT INFORMATION SOUGHT WAS
           PROTECTABLE IN THE MANNER DEFENDANTS
           REQUESTED .............................................................13

    E.    THE MAGISTRATE'S ORDERS ERRONEOUSLY STATE
           THAT TURN-KEY THE ENTRY OF ANY PROTECTIVE
           ORDER.....................................................................13

    F.    THE MAGISTRATE'S ORDERS DID NOT FULLY ADDRESS
           THE POTENTIAL OF ABUSE IN GIVING AUTOMAKERS
           THE UNILATERAL RIGHT TO DESIGNATE EVIDENCE
           REGARDING THE MERITS OF TURN-KEY'S LITIGATION
           COUNSEL FROM REVIEWING IT, AND THEREBY DEPRIVE
           TURN-KEY OF THE ABILITY TO FULLY AND FAIRLY
           LITIGATE ITS CASE...................................................14

CONCLUSION ............................................................................15

i.

# TABLE OF AUTHORITIES

**Statutes**

35 U.S.C. §295…………………………………………………………………….……..2

35 U.S.C. §271(g) ……………………………………………………………….……3, 4

**Cases**

*Lockwood v. American Airlines, Inc.,* 1992 U.S.Dist. LEXIS 22077
(S.D.Cal. 1992) ……………………………………………………………………..6

*U.S. Steel Corp. v. U.S.,* 730 F.2d 1465, 1468-9 (Fed.Cir. 1984) ……………………..6

*Hart v. Massanari,* 266 F.3d 1155 (9th Cir. 2001)………………………………………6

*Intel Corp. v. VIA Technologies, Inc.,* 198 FRD 525, 527 (N.D. Cal. 2000) …………7, 8, 9

*Brown Bag Software v. Symantec Inc.* 960 F.2d 1465, 1470-1 (9th Cir. 1992) …..7, 10, 11

*Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 766 (2d Cir. 1983)……………………12

*Cascade Corp. v. Hiab-Foco AB,* 619 F2d 36, 38 (9th Cir. 1980) ……………………12

*Graphic Controls Corp. v. Utah Med. Prods.,* 149 F.3d 1382, 1387 (Fed.Cir. 1998) ….12

*KVH Indus., Inc. v. Moore,* 789 F. Supp. 69, 73 (D.R.I 1992)…………………………12

1    Pursuant to Federal Rules of Civil Procedure, Rule 72(a), Turn-Key-Tech, LLC,

2    ("Turn-Key") hereby respectfully objects to Magistrate Judge Stormes's April 8, 2002

3    Order Denying Turn-Key's Motion to Reconsider Order Granting Motion for a

4    Protective Order issued in both Case no. 99CV0321 L (NLS) ("Nissan Case") and Case

5    no. 00CV0642 L (NLS) ("Chrysler Case") (the "Reconsideration Order"), and the April

6    5, 2002 Order Granting Plaintiffs' Motion for a Protective Order in Case no. 01CV2109

7    L (NLS) ("Stanley Case") and hereby renews its Objection, previously taken off

8    calendar without prejudice as premature, to the February 15, 2002, Order Granting

9    Defendant North American Lighting, Inc.'s Motion for a Protective Order in the Nissan

10    Case; and the February 20, 2002, Order Granting Motion for Protective Order in the

11    Chrysler Case, (collectively the Reconsideration Order and the three orders granting

12    protective orders are all referred to herein as, "Magistrate's Orders").

13    **SUMMARY**

14    Turn-Key respectfully objects to the Magistrate's Orders excluding Turn-Key's

15    litigation counsel from attorney's eyes only information.  These Magistrate's Orders

16    effectively end the litigation for Turn-Key by precluding Turn-Key's litigation counsel,

17    specifically Mr. Seth, of his ability to take the depositions, including expert depositions,

18    and develop infringement, willful infringement and damages evidence to prepare this

19    case for trial.  This harms Turn-Key in manner that is grossly disproportional to the

20    asserted harm to the Defendants that they seek to prevent.  For instance, the Automakers

21    are relying upon the Magistrate's Orders to refuse to appear or produce witnesses for any

22    deposition if Mr. Seth is conducting the deposition, asserting that the deposition might go

23    into "attorneys' eyes only" evidence.

24    The Magistrate's Orders found that Turn-Key was a competitor where there was

25    no evidence that Turn-Key sold products or services in competition with any of the

26    defendants.  The Orders also found Turn-Key's settlement talks were "competitive"

27    when the evidence showed that (a) all of Turn-Key's licenses to date under the '268

28

1  patents have been in connection with settling infringement disputes; and (2) there was no

2  evidence that Turn-Key competed with anyone for the sale of any technology.

3      By finding Turn-Key a competitor to the automakers and the manufacturing

4  agents in their manufacturing chains, and Turn-Key's litigation counsel "competitive

5  decisionmakers", the Magistrate's Orders excluded both Turn-Key's party

6  representatives and litigation counsel from infringement information.  The Magistrate's

7  Orders granted this relief without <u>any evidence</u> that the infringement information was

8  actually trade secret information and that the defendants would be <u>competitively</u> harmed

9  by disclosure.

10      Specifically, recognizing that "the party seeking a protective order must show that

11  the information sought to be protected is in fact confidential" (Order at 10-11), the Court

12  did not make any finding that the infringement information sought pursuant to 35 U.S.C.

13  §295 was actually a trade secret or that its disclosure would <u>competitively</u> harm the

14  defendants.[1]    The relief was granted without the Defendants ever identifying a single

15  item of infringement information that was actually trade secret or made any showing of

16  any risk of actual competitive harm by its disclosure.

17      The Court erroneously found:

18      1.      Turn-Key is a market competitor of the Automakers or their

19              manufacturing agents, contrary to the uncontroverted evidence in the

20              record that Turn-Key does not compete with them for market share

21              of any of their products or services.

22      2.      Turn-Key's litigation attorneys were "competitive decisionmakers,"

23              contrary to the uncontroverted evidence that such lawyers only

24              duties were to settle, litigate or try the infringement cases.

25  _____

26  [1]  Several parties have provided short shot samples in the process of substantively resolving the
        infringement dispute, including TDK and Sony.  While all were provided under provisions of
27      confidentiality so as not to be disclosed to any third-parties including actual competitors, these parties
        did not prevent Turn-Key's technical representatives (Mr. Sorensen and Mr. Brown) from this
28      information.

3.        The asserted harm to defendant justified exclusion of Turn-Key's witnesses and litigation counsel from the evidence in this case without any showing of trade secret status or competitive harm.

4.        Defendants were entitled to a presumption that the information sought to be protected was protectable in the manner they requested.

5.        Turn-Key was opposed to the issuance of any protective order.

The Orders also did not fully consider the potential for abuse in giving the Automakers the right to use a designation that would keep information regarding the merits of Turn-Key's case from Turn-Key's litigation counsel and thereby deprive Turn-Key of the ability to fully and fairly litigate its case. Switching what should be the burden of the party opposing disclosure of an item to bring a specific motion for a protective order, to force Turn-Key to bring motions to compel whenever Automakers elect to designate damaging evidence as attorneys' eyes only.

To alleviate the Court's concerns about inadvertent disclosure, Turn-Key's counsel have offered to and are prepared to obtain office space that is not co-located in the same building with Turn-Key's offices. All storage and review of confidential evidence will be conducted at these new offices.

## BACKGROUND

This action is brought to resolve a multi-year dispute regarding the infringement of the '268 patent by Nissan's and Chrysler's (collectively, "Automakers") manufacture, through various manufacturing agents, and subsequent import into and sales within the United States, of certain of their auto parts. Automakers are the principal manufacturers liable in the U.S. for using a U.S. patented process in its manufacturing chain for products that it sells in the U.S.

Prior to the enactment of 35 U.S.C. §271(g) in 1988, Automakers could use a party located outside the United States to make a part for them using a United States Patented Process, and still avoid infringement when they subsequently imported the part into and sold the part within the United States. That loophole was closed by the

1  enactment of §271(g). Moreover, in order to comply with GATT obligations, the statute
2  was written to apply equally to Automakers' manufacture of parts using agents in its
3  manufacturing chain located either in the United States or abroad.

4      In 1998, Turn-Key began analyzing tail lights when it suspected that Automakers
5  may be using the '268 method without a license. Turn-Key confronted Automakers with
6  drawings of its analysis of certain Automakers tail light lenses that Turn-Key had
7  suspected were made using the '268 method. Turn-Key also gave Automakers the
8  opportunity to demonstrate non-infringement with a type of flow test, called a "short shot
9  sample." These samples reveal the actual flow directions of plastic inside of the molds
10  during injection molding.

11      Turn-Key also informed Automakers that it did not wish to stop their use of the
12  patented method, and that Turn-Key was willing to amicably settle the matter with a
13  license. The Automakers declined to take a license or provide short shot samples
14  demonstrating non-infringement. Turn-Key has continued its attempts to resolve this
15  matter amicably, to no avail.

16      Turn-Key is a small San Diego research and development company taking a stand
17  in defending its invention against infringement by industry giants. The social impact of
18  this case is significant. Small inventors, like Turn-Key, have long had their patent rights
19  trounced upon by those who are larger and financially stronger. Most small companies
20  cannot defend their patent rights against these resourceful giants, because mounting such
21  a defense can take years and cost millions of dollars. In keeping with their inventive
22  spirit, Turn-Key took a novel approach. It hired two intellectual property litigators
23  (including the undersigned) and one general civil federal litigator, Mr. Kaler, to work
24  exclusively on its cases in defending its patent rights.

25      It is important for inventors, like Turn-Key, to protect their intellectual property
26  rights. For example, Turn-Key has spent the greater part of the last six years in
27  developing a new lightweight plastic drinking cup, that uses about half as much plastic to
28  make as the comparable plastic cups on the market today. This new cup is exciting

because it uses less petroleum in its production as plastic is made from oil. As conservation of diminishing oil supplies is critical, such a cup can have significant benefit to the country and the world. By some estimates, more than 10 billion plastic cups are consumed per annum in the U.S. alone. As the U.S. still only recycles a small percentage of these cups, the environmental impact of throwing away half of the plastic per cup is alone staggering.

It is precisely these types of innovations for which research companies like Turn-Key exist. The U.S. is sustained by the technologies it develops, and these technologies maintain its leadership in the world. Turn-Key has received 10 patents covering the various technologies that go into this cup, with three more applications pending. Turn-Key has spent six years and millions of dollars in developing these technologies. Without patent rights, it cannot protect its technology from those who would just take it, leaving Turn-Key's efforts financially fruitless and Turn-Key unable to continue working on developments in plastics technology.

The automotive industry is tough. Their main resource is their enormity and it is a notorious auto industry practice, to take the technology and force small inventors to either accept the theft or withstand a long war of attrition. One famous example of this practice is the Kearns Cases. Kearns, the intermittent windshield wiper inventor, consumed most of his adult life seeking to have the Automakers license his technology, which the Automakers were using without his consent. This has been the Automaker's strategy with respect to the '268 cases, ever since Turn-Key discovered that the automakers were secretly using this United States patented technology through their domestic and overseas manufacturing agents.

The time and resources expended to stopping its infringement by licensing have been enormous. So, far, Turn-Key has been able to settle infringement by TDK Corp., Hitachi-Maxell Corp., Ichikoh Industries and most recently, Sony Corporation.

## SPECIFIC LEGAL AND FACTUAL ERRORS IN THE ORDERS

Turn-Key objects to the following specific legal errors and factual findings

1    unsupported by the record, or contradicted by the record, contained within the Orders.

2    1.    The Magistrate's Orders treat Turn-Key's litigation counsel different from
3          all other firms and counsel in this case, contrary to the evidence that Turn-
4          Key's counsel did not engage in any duties in their representation of Turn-
5          Key that is materially different from the activities of the counsel for the
6          other parties in the litigation. *U.S. Steel Corp. v. U.S.,* 730 F.2d 1465, 1468-
7          9 (Fed.Cir.1984).

8    2.    The Magistrate's Orders cite to and rely upon the unpublished district court
9          decision in *Lockwood v. American Airlines, Inc.,* 1992 U.S.Dist. LEXIS
10         22077 (S.D.Cal. 1992) in violation of Ninth Circuit Rule 36-3 and *Hart v.*
11         *Massanari,* 266 F.3d 1155 (9th Cir. 2001), and expressly declined to
12         consider Turn-Key's objection to Defendants' citation to the unpublished
13         decision, and directed the clerk not to file the objection.[2]

14   3.    The Magistrate's Orders hold, without evidentiary support, that Turn-Key
15         is a competitor of the Automotive parties, and implicitly holds that the mere
16         act of seeking to defend one's patent rights (i.e. "licensing activities"
17         Reconsideration Order 3:8-13) makes one a competitor of an alleged
18         infringer of one's patent for purposes of "confidential" evidence and
19         protective order analysis. Magistrate's Orders 6:18-19, and 12:7-11[3].

20   4.    The Magistrate's Orders improperly hold that Turn-Key is a competitor of
21         the Defendants because "some potential licensees are defendant's
22         competitors in the marketplace." Magistrate's Orders 6:17-19

23   5.    The Magistrate's Orders expressly finds that the sending of settlement
24         letters in the context of a patent dispute, prior to and during the course of
25         litigation, is sufficient to hold that counsel is engaged in "competitive

---

26

27   [2]   Order to Remove Plaintiff's Objection, filed February 19, 2002

28   [3]   Citations to Magistrate's Orders refer to the Original order issued in the Nissan Case unless expressly
         identified to refer to the Reconsideration Order, Chrysler Order, or Stanley Order.

1    decision making." Magistrate's Orders 6:19-21.

2    6.    The Magistrate's Order erroneously find that there is no hardship to Turn-

3          Key (page 7, fn. 1) when Mr. Seth has spent four years litigating the '268

4          patent and has developed specific technical knowledge with regard to the

5          patent and surrounding technology that would be difficult and time-

6          consuming for another attorney to duplicate.

7    7.    The Magistrate's Orders issued without conducting a hearing of any kind

8          despite unrebutted declarations of Mr. Seth and Mr. Kaler that they did not

9          perform any legal services for Turn-Key other than defense of patent rights.

10         An evidentiary hearing is implicitly a requirement to properly evaluate the

11         facts before issuing an order barring a party's counsel from access to

12         confidential evidence. *Brown Bag Software v. Symantec Inc.* 960 F.2d

13         1465, 1470-1 (9th Cir. 1992). *Intel Corp. v. VIA Technologies, Inc.,* 198

14         FRD 525, 527 (N.D. Cal. 2000).

15   8.    The Magistrate's Orders appear concerned with risk of inadvertent

16         disclosure from the co-location of Turn-Key's counsel in the same building

17         with Turn-Key's offices. Magistrate's Orders at 6:21-25. Turn-Key's

18         counsel are prepared to obtain office space in a different location where all

19         storage and review of confidential evidence will occur to avoid such risk.

20   9.    The Magistrate's Orders erroneously find that the ruling in *Brown Bag*

21         *Software v. Symantec Inc.* 960 F.2d 1465, 1470-1 (9th Cir. 1992) is on point.

22         *Brown Bag* is distinguishable because the attorney was general corporate

23         counsel for all purposes, he did not serve purely as litigation counsel.

24         Messrs. Seth and Kaler serve only as litigation counsel, and have no other

25         role for Turn-Key.

26   10.   The Magistrate's Orders erroneously find that the ruling in *Intel Corp. v.*

27         *VIA Technologies, Inc.,* 198 FRD 525, 527 (N.D. Cal. 2000) is on point.

28         *Intel* is distinguishable because the attorney was *Intel's* corporate counsel

who was not actively litigating the case, but was merely the in-house contact person supervising the outside litigation team for Intel. Further, the *Intel* decision turned on the Court attempting to prevent *Intel* from using its greater resources to gain an unfair advantage in the litigation.

11.  The Magistrate's Orders exclude Messrs. Seth and Kaler from access to evidence designated by the Defendants as "Attorneys' Eyes Only" by how they are paid for their representation.

12.  The Magistrate's Orders makes the following factual statements that are unsupported by any evidence in the record, or are contradicted by all evidence therein:

   a.  The Court mistakenly states:  "Plaintiff Turn-Key-Tech argues that a protective order is unwarranted and unnecessary." Magistrate's Orders 1:22-23.  Turn-Key did not take that position, and in fact initiated discussions with all parties regarding stipulated protective orders, and was rebuffed.

   b.  The Court mistakenly states: "Plaintiff's position is that Messrs. Seth, Kaler, Brown and Sorensen must have unlimited access to all of defendant's confidential documents and information."  Magistrate's Orders 2:22-23.  On the contrary, Turn-Key sought to have its litigation counsel have access to all discoverable evidence, but agreed that Brown and Sorensen have access only to short shot samples.

   c.  Implicitly finds, without evidence, that the availability of other experts renders the testimony of the patent inventor (Sorensen), and the witness with the most extensive experience examining products for infringement of the patent (Brown) superfluous. Magistrate's Orders 9:4-16.

/ / /

1
2

    **A.**      **The Court's Holding that Turn-Key Was A Market Competitor of the Automakers Or Their Manufacturing Agents is Erroneous As a Matter of Law**

3
4
5
6
7
8
9

    The Court misapplied the law in finding Turn-Key to be a market competitor of the Automakers or their manufacturing agents.   The record is overwhelming that Turn-Key does not compete for market share with the Automaker or their manufacturing agents  (unless they are about to go into cup-making, as is Turn-Key).   Indeed, the Defendants have on numerous occasions pointed out to the Court that Turn-Key is only entitled to a reasonable royalty in this case, and not lost profits which are only available to a market competitor.

10
11
12
13
14
15
16

    In *Intel Corp. v. VIA Technologies, Inc.,* 198 FRD 525 (N.D. Cal. 2000), the defendant, Via, was a "<u>direct competitor</u> which would be <u>competitively disadvantaged</u> by disclosure of information" to Intel in a market dominated by Intel.   Specifically, the parties were direct market competitors in the chip market, and the information regarding Via's chips, chip licenses, and chip marketing agreements obtained by Intel's in-house counsel in the litigation could be abused to Intel's competitive advantage in Intel's push for even greater market share.

17
18
19
20
21

    Here, the record was unrebutted that Turn-Key did not make any products that used the '268 technology or that competed with any of the products or services of the Defendants.   It was legally incorrect for the Court to expand the definition of competition and conclude that Turn-Key was a competitor to the Defendants in order to address Defendants asserted concerns regard inadvertent disclosure of trade secret information.

22
23
24

    **B.**      **The Court's Holding that Turn-Key's litigation attorneys whose only duties were to settle, litigate or try the infringement cases were "competitive decisionmakers" is Erroneous As A Matter of Law.**

25
26
27
28

    The Magistrate's Orders compound the error by finding that Turn-Key's counsel whose representation of Turn-Key is limited solely to settling, litigating, or trying infringement disputes, were competitive decision makers.   This was a separate error beyond the question of whether Turn-Key was a market competitor to the Defendants.

1    The Court recognized that "counsel involved in competitive decisionmaking **is**

2    **advising on decisions about pricing or design made in light of similar or**

3    **corresponding information about a competitor,**" (Magistrate's Order at 4:20).  The

4    Court then failed to consider the evidence that Turn-Key's counsel did not advise on any

5    decisions about pricing or design made in light of similar or corresponding information

6    about the Automakers' products and that Turn-Key's actual business and technical

7    persons made no such competitive business decisions either.

8    *Brown Bag,* 960 F.2d at 1470-71, involved two competitors for the same type of

9    "outlining" software programs and Brown Bag's litigation counsel was involved "in

10   decisions about pricing or design" there could be  "made in light of similar or

11   corresponding information about [Symantec]," including a "host of contract,

12   employment, and <u>competitive marketing decisions</u>" and was thus involved in

13   "competitive decisionmaking." *Id*.  Moreover, Brown Bag's attorney was also

14   "responsible for advising his employer on **a wide variety of issues**."  Magistrate's Orders

15   at 24-26.

16   In contrast, Turn-Key is not a direct competitor or an indirect competitor to any

17   Automaker or their lens assembly manufacturing agent.  Mr. Seth's representation is

18   directed only to the defense of the '268 patent, and Mr. Seth has worked on no other

19   matter for Turn-Key for four years.  The '268 cases are of a highly technical nature.  Mr.

20   Seth has very specialized knowledge of these cases, and the underlying technology.  It

21   has been more than one year since any outside counsel was involved in these cases.  Now

22   at this crucial discovery stage of the litigation during which Mr. Seth's specialized

23   knowledge will come to bear in both fact and expert witness depositions, the Magistrate's

24   Order precludes Turn-Key from effectively litigating its case.  In view of the fact that

25   Turn-Key is not a competitor of the Automakers, and Mr. Seth is not involved in any kind

26   of competitive decisionmaking, it was beyond the discretion of the Court to grant the

27   motion with respect to Mr. Seth.

28   / / /

C.   **The Court Erroneously Concluded that the Asserted Harm to Defendant justified exclusion of Turn-Key's witnesses and litigation counsel from the evidence in this case without any showing of trade secret status or competitive harm.**

The Court was required to compare "the risk of inadvertent disclosure of trade secrets to a competitor, against the risk ... that protection of ... trade secrets impaired prosecution [of the discovering party's] claims." It was error for the Court to find Turn-Key a competitor, to allow Defendants to exclude any information without a showing that it was a trade secret, and to exclude Turn-Key's litigation counsel without fully considering the balance of harm to Turn-Key by its inability to prosecute the cases if Mr. Seth was excluded from any information designated as attorney's eyes only. Defendants did not specifically articulate how or by what disclosure they would be *competitively* prejudiced. Defendants merely asserted that disclosure of the requested infringement information could contain trade secrets that the disclosure of which could harm them.

In *Brown Bag*, the Court held an extensive evidentiary hearing in which Symantec actually established the trade secret nature of the computer code sought to prove the copyright infringement claim before it was considered excludable from Brown Bag's lawyer and furthermore the protective order provided Brown Bag's lawyer access to essential documents through independent experts. *Id.*

Here, the real competitive risk to the automakers was non-existent. Indeed, NAL and Nissan, the parties who originally moved for the order, stipulated after its grant that Mr. Brown and Mr. Sorensen could have access to short shot samples. In addition to showing the actual flow directions taking place inside of the mold during commercial injection molding, such samples show not only the actual flow directions taking place inside of the mold during the injection molding, but also the mold cavity geometry for each injection, injection sequences and timings, and gate locations.

The prejudice to Turn-Key is beyond not being advised about the case or the ability to properly oversee outside counsel, but the very ability for Turn-Key to take the necessary discovery and prepare for trial. Mr. Seth's loss of ability to litigate impairs

1  Turn-Key's ability to even litigate with co-counsel.  In Intel, the inside counsel had not

2  litigated for 5 years and no impairment to Intel's ability to litigate with outside co-

3  counsel had been demonstrated.  In contrast, Mr. Seth has continuously litigated these

4  cases for the last four years.  Mr. Seth moved his practice and residence from Colorado to

5  California specifically in order to litigate these cases and the magnitude of the actual

6  harm to Turn-Key far outweighs Defendants' speculative concerns of harm.

7       The Order correctly recognizes that the risk of inadvertent disclosure exposes the

8  defendant to significant potential injury where "the information would be used to

9  duplicate 'defendants' products, compete for its customers, or interfere with its business

10  plan and thereby gain a <u>competitive</u> advantage in the marketplace." Order at 6:4-5.  The

11  Court then erroneously finds that Turn-Key becomes a competitor by virtue of defending

12  its patent rights against Defendants, with no market competition between them.

13       The Court may have mistaken defending legal rights with doing business.  If so,

14  this was due to bad briefing on the part of Turn-Key, for which Turn-Key must

15  apologize.  Defending one's legal rights, particularly against a company with whom one

16  does not compete with for products, services or customers, is not doing business and

17  does not, in fact, form a basis for the exercise of personal jurisdiction.  _See e.g._ _Cascade_

18  _Corp. v. Hiab-Foco AB_, 619 F.2d 36, 38 (9th Cir. 1980) (letters claiming patent

19  infringement were not enough to invoke personal jurisdiction); _Graphic Controls Corp._

20  _v. Utah Med. Prods._, 149 F.3d 1382, 1387 (Fed. Cir. 1998) (**patent cease and desist**

21  **letters were not the "transaction of business"**); _Beacon Enters., Inc. v. Menzies_, 715

22  F.2d 757, 766 (2d Cir. 1983); _KVH Indus., Inc. v. Moore_, 789 F. Supp. 69, 73 (D.R.I.

23  1992) (letter charging patent infringement "cannot be the sort of meaningful, purposeful

24  forum contacts the Supreme Court had in mind in Burger King and Asahi Metal").  Since

25  sending letters is not even the **"transaction of business,"** and is insufficient to confer

26  even specific jurisdiction, it follows that it is not sufficient activity to be competitive

27  decisionmaking.

28

1    If this were not the state of the law, then any law firm involved in infringement

2    settlement negotiations would be excluded from attorney's eyes only information

3    produced by Turn-Key under the standard of the Magistrate's Orders, because the law

4    firm would thereby be a competitive decisionmaker.  Nor could any outside counsel ever

5    represent more than one unrelated or competing defendants in related infringement suits

6    under the Magistrate's Orders' standard, because they could inadvertently disclose what

7    they learned from Turn-Key in one lawsuit or settlement to the client in the other lawsuit

8    or settlement.

9    For example, the Sughrue Mion firm, which brought the protective order motion in

10   the Nissan case, represents NAL, Koito, Kia and Hyundai, could not meet the standards

11   of the Magistrate's Orders.   Nor could the Morgan, Lewis & Bockius firm, which

12   represents both Chrysler and Stanley Electric Co.   Kenyon & Kenyon, who firm which

13   represents Toyota, could also not meet the standards because Kenyon & Kenyon

14   represented Maxell in the settlement of its '268 infringement dispute with Turn-Key.

15   The statements made by Turn-Key's counsel that they did not participate in

16   competitive decisionmaking were factually supported and unrebutted, and form the only

17   competent evidence on this issue in the record.

18   **D.        By Not Requiring Any Evidence, the Court Erroneously**

19   **Concluded that the Infringement Information sought**

20   **was Protectable in the manner Defendants Requested.**

21   Here, the Court presumed that Defendants were actually seeking to suppress trade

22   secret information and that this information was unrelated to this case.  The Court also

23   presumed a risk of competitive harm by finding Turn-Key to be a competitor.

24   **E.        The Magistrate's Orders Erroneously State that Turn-Key**

25   **Opposed  the Entry of Any Protective Order**

26   The  Magistrate's  Orders  misunderstand  Turn-Key's  positions  regarding  a

27   protective order, and erroneously find that Turn-Key was opposed to the entry of any

28   protective order.  Turn-Key again apologizes if its briefing was at fault in leading to the

1   confusion. Turn-Key explicitly had sought to work out protective orders since the start of

2   discovery, but the Defendants would not enter into a protective order that did not exclude

3   Turn-Key's counsel.   During the pendency of the protective order motions, Turn-Key

4   then sought the entry in the automotive cases of the same type of protective order that it

5   stipulated to and which was actually entered by the Court in the *Fuji* Case.  This order

6   had two tiers of information:  one level which only the litigation counsel and independent

7   experts could access, and a second level which would be used only for the purpose of the

8   litigation and which could be reviewed by a specifically enumerated "core group" of

9   party representatives for each party.

10          Protective orders are used to prevent information disclosed during discovery from

11  being used outside of the litigation or disclosed to any person not authorized to receive

12  the information under the order. Turn-Key is and has always been seeking to

13  accommodate its needs in this case and has been willing to agree to protect Defendants

14  confidential information and its non use outside of the case.   With regard to technical

15  information, Turn-Key does not seek Mr. Sorensen or Mr. Brown's access to any

16  information other than short shot samples, which they were willing to place in the core

17  group tier, so that such samples could be neither disclosed to third-parties nor used

18  outside of this litigation.  Defendants used this protection meant to insure fairness as a

19  strategic tool to tilt an already grossly tilted playing field.

20    **F.**     **The Magistrate's Orders did not fully address the potential**
21            **for abuse in giving Automakers the unilateral right to**
              **designate evidence regarding the merits of Turn-Key's case**
22            **in a manner that would exclude Turn-Key's litigation**
              **counsel from reviewing it, and thereby deprive Turn-Key of**
23            **the ability to fully and fairly litigate its case.**

24          The Magistrate's Orders did not fully address the potential for abuse in giving

25  Automakers the unilateral right to designate evidence regarding the merits of Turn-Key's

26  case in a manner that would exclude Turn-Key's litigation counsel from reviewing it, and

27  thereby deprive Turn-Key of the ability to fully and fairly litigate its case.  Indeed, since

28  the protective order issued:

1      a.  Defendants have refused to appear for depositions unless assured that Turn-
2          Key's lawyers would not conduct them, notwithstanding that all prior
3          depositions were conducted by the Turn-Key lawyers.

4      b.  Defendants refuse to produce to Turn-Key's lawyers broad categories of
5          information unilaterally designated as attorney's eyes only.

6  **CONCLUSION**

7      These objections have been filed in order to preserve and address them if

8  necessary.  Turn-Key's Counsel have also decided to relocate to separate offices.

9

10  Dated:  April 19, 2002              Respectfully submitted,

11                           SETH LAW OFFICES

12

13                      By: _For Sandeep Seth_

14                        Sandeep Seth
                         Attorneys for TURN-KEY-TECH, LLC
                         and JENS OLE SORENSEN

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

I, Melissa Pedrajita declare: I am and was at the time of this service employed in the County of San Diego, California. I am over the age of 18 years and not a party to the within action. My business address is Seth Intellectual Property Law Offices, 9930 Mesa Rim Road, Suite 100, San Diego Suite 100, California, 92121. I am employed in the office of a member of the bar of this court, at whose direction this service was made. On **April 19, 2002**, I served on the parties to this action the following documents:

1) **TURN-KEY-TECH, LLC'S OBJECTION TO MAGISTRATE'S ORDERS GRANTING MOTIONS FOR PROTECTIVE ORDERS AND DENYING RECONSIDERATION OF SUCH ORDERS**

2) **DECLARATION OF J. MICHAEL KALER IN SUPPORT OF OBJECTIONS TO MAGISTRATE'S ORDERS**

| Attorney | Party(ies) Served | Method of Service |
|---|---|---|
| **Frank L. Bernstein** Sughrue, Mion, Zinn, MacPeak & Seas, PLLC 1010 El Camino Real, Ste. 360 Menlo Park, CA 94025 Telephone: (650) 325-5800 Facsimile: (650) 325-6606 | Attorney for Defendant NORTH AMERICAN LIGHTING, INC., KOITO MANUFACTURING LTD. | **VIA FACSIMILE AND U.S. MAIL** |
| **Timothy A. Horton** Latham & Watkins 701 "B" Street, Suite 2100 San Diego, CA 92101-8197 | Attorney for Defendant NISSAN | **VIA FACSIMILE AND U.S. MAIL** |
| **Jeffrey N. Brown** MORGAN, LEWIS & BOCKIUS 300 South Grand Ave., Suite 2200 Los Angeles, CA 90071 Telephone: (213) 612-2500 Facsimile: (213) 612-2554 | Attorneys for STANLEY ELECTRIC CO., LTD. et al. | **VIA FACSIMILE AND U.S. MAIL** |
| **Timothy P. Maloney** FITCH, EVEN, TABIN & FLANNERY 120 South LaSalle, Suite 1600 Chicago, IL 60603-3406 Telephone: (312) 577-7000 Facsimile: (312) 577-7007 | Attorneys for DAIMLERCHYRSLER CORP. | **VIA FACSIMILE AND U.S. MAIL** |

1

☒ (BY U.S. MAIL)  I deposited or caused to be deposited today with the United States
Postal Service a sealed envelope containing a true copy of the foregoing documents with
postage fully prepaid addressed to the above noted addressee.

2

☐ (VIA FEDEX)  I caused a sealed envelope containing a true copy of the foregoing
document to be placed today with FedEx, delivery charge paid by sender, addressed to
offices of each above noted addressee for overnight delivery.

3

4

☒ (FACSIMILE)  I caused a true and correct copy of the foregoing documents to be transmi

5

tted by facsimile machine to each above noted addressees.  The facsimile transmissions
were reported as complete and without error.

6

I declare that foregoing is true and correct, and that this declaration was executed on

7

**Friday, April 19, 2002**, at San Diego, California.

8

9

10

Melissa Pedrajita

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28